

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-17-00252-CV

———————————————————

LANTEK COMMUNICATIONS, INC., Appellant

V.

HAMILTON PECK, Appellee

On Appeal from the 141st District Court
Tarrant County, Texas
Trial Court No. 141-286694-16

Before Sudderth, C.J.; Meier and Gabriel, JJ.
Memorandum Opinion by Chief Justice Sudderth

# MEMORANDUM OPINION

This case arises from a dispute among former business associates. The parties appeal the trial court's orders granting, in part, each of their respective motions for summary judgment, and Appellant Lantek Communications, Inc. (Lantek) appeals the trial court's entry of final judgment in favor of Appellee Hamilton Peck. We affirm.

## Background

Peck, Domingo Mayorga, and Ester Mayorga were shareholders in Lantek, a contractor for audio and visual system construction and integration. At the heart of this suit is the division of proceeds earned by Lantek for audio and visual work performed as part of the remodel of Terminal B of the Dallas/Fort Worth International Airport (DFW Airport). Specifically, the parties dispute the division of the proceeds awarded for Phase 3 of the project and which they agreed to share pursuant to a settlement agreement entered into when Peck cut ties with Lantek.

## I. Peck sued Lantek, and they entered into the Settlement Agreement.

In late 2012, Peck's relationship with the Mayorgas deteriorated and in 2014 Peck filed suit against Domingo Mayorga and Lantek. In mid-2015, they settled and entered into a "Rule 11 Settlement Agreement" (the Settlement Agreement).

### A. Relevant terms of the Settlement Agreement

In the Settlement Agreement, Lantek agreed to pay Peck $5,000,000 for his 50% stake in Lantek. The parties also agreed that Lantek would pay an "additional conditional payment" to Peck if Lantek was awarded a contract for Phase 3 of the

2

Terminal B project. Specifically, Lantek would pay 10% of the initial contract price, up to a maximum of $1,000,000, for the scope of work contemplated by the June 30, 2011 bid for the project. The parties agreed that in determining the "initial contract price," any base contracts for the scope of the work encompassed in the June 30, 2011 bid would be included but that change orders would be excluded. They also agreed that they would not engage in any jiggery-pokery[1] in an attempt to alter the definition of the contract. Specifically, the agreement provided:

> a) The scope of work defined in Phase 3A through 3C on the bid documents dated 6/30/2011 (attached) encompass the anticipated Phase 3 contract anticipated to be awarded by DFW in 2016 or 2017.
>
> b) 10% of the initial contract price (including all base contract(s) for the scope of work defined above, but excluding all change orders) awarded to Lantek . . . for the DFW Terminal B Phase 3 contract shall be paid to Peck – up to a maximum of $1,000,000.
>
> . . . .
>
> c) Both parties agree that they shall take no action to influence DFW to alter their definition of the DFW Terminal B Phase 3 contract for the purpose of jiggery-pokery with this contract.

## II.  Lantek was awarded the Terminal B Phase 3 project.

Lantek was subsequently awarded the Terminal B Phase 3 contract, and Lantek entered into a subcontract (the Subcontract) with the general contractor for the

---

[1]"Jiggery-pokery" is a two-centuries-old term of English origin meaning "underhanded dealings, conniving, or manipulations," Webster's Third New Int'l Dictionary 1216 (2002), which was most recently resurrected in the law by Justice Antonin Scalia in his dissent in *King v. Burwell*, 135 S. Ct. 2480, 2500 (2015) (Scalia, J., dissenting).

Terminal B project, Manhattan Construction Company (Manhattan), in October 2015. In the subcontract, Manhattan agreed to pay Lantek $402,155 as an "Early Start Enabling (Partial Funding)" payment, "in an effort to achieve an early start for enabling activities in Phase 3." The contract further provided that this $402,155 was subject to "additions and deductions for changes agreed upon in writing as hereinafter set forth or as otherwise authorized hereinafter." In addition, the contract also provided that Lantek would receive a "Guaranteed Maximum Price" (GMP) not to exceed $9,190,545 for the sum of the cost of work and the subcontractor's fee for the work. It also provided that this increase would be accomplished through a change order.

### A. Two "change orders" were issued, including one for $8,494,473.94.

On April 21, 2016, Manhattan issued a "Subcontract Change Order" (Change Order One) authorizing a payment of $8,494,473.94 to Lantek. Change Order One included the following table and summary:

| Job Number | Previous Contract Amount | Revision This Change Order | Revised Contract Amount |
|---|---|---|---|
| 4313-- | $402,155.00 | $8,494,473.94 | $8,896,628.94 |
| TOTALS | $402,155.00 | $8,494,473.94 | $8,896,628.94 |

| | |
|---|---|
| The original Contract Value was | $ 402,155.00 |
| Sum of changes by prior Subcontract Change Orders | $ 0.00 |
| The Contract Value prior to this Subcontract Change Order was | $ 402,155.00 |
| The Contract Value will be changed by this Subcontract Change Order in the amount of | $ 8,494,473.94 |
| The new Contract Value including this Subcontract Change Order will be | $ 8,896,628.94 |
| The Contract duration will be changed by | 548 Days |
| The revised Substantial Completion date as of this Subcontract Change Order is | 12/8/2017 |

Three months later, on July 13, a second "change order" (Change Order Two) was issued. Unlike Change Order One, which only included a single line item

4

denoting the $8,494,473.94 cost with no description of specific work to be performed except for a global reference to "CL-021 Lantek – GMP," Change Order Two contained seven line items with descriptions of additional work to be performed such as, "CL-050 Lantek – RFI 0007 – Temporary Tunnel CCTV & AACS," "CL-062 – Lantek – RFI 0013 – Demo Aircraft maintenance space between CL 64-67 E," and "CL-074 Lantek – RFI 0050 – SSD Kiosk Install in Phase 1." Change Order Two provided that, with this additional work, the contract amount would increase by $7,225.01.

## III. Lantek refused to pay Peck 10% of the $9,190,545 and filed suit for a declaratory judgment.

Lantek attempted to pay Peck 10% of the $402,155, but Peck asserted that he was entitled to 10% of the $9,190,545 identified as the GMP in the Subcontract.[2] In July 2016, Lantek filed a suit seeking a declaratory judgment that Change Order One is a change order that was expressly excluded from the calculation of what Lantek owed Peck under the Settlement Agreement. Peck answered and filed counterclaims, essentially arguing that Lantek's actions constituted jiggery-pokery with the Settlement Agreement. Peck sued Lantek for breach of contract and fraud and sought exemplary

---

[2]The parties have stipulated to the amount of Peck's damages if the trial court's order granting Peck's summary judgment is affirmed on appeal. Therefore, we do not need to consider the discrepancy between the sum of the Early Start Enabling amount ($402,155) and the amount of Change Order One ($8,494,473.94), on the one hand, and the $9,190,545 figure in dispute between the parties, on the other.

5

damages and attorney's fees. In response, Lantek pleaded several affirmative defenses, including release. Both parties filed motions for summary judgment.

### A. Lantek's motion for summary judgment

In Lantek's motion for partial summary judgment it argued that Peck was not entitled to any of the money included in Change Order One because the Settlement Agreement was unambiguous in excluding any change orders from the portion of the Phase 3 contract proceeds payable to Peck.[3] Lantek attached as evidence and relied solely upon the terms of the Settlement Agreement, the terms of the Subcontract, and Change Order One.

### B. Peck's response and motions for summary judgment

Peck responded and filed his own motion seeking a traditional summary judgment on his claim that Lantek breached the terms of the Settlement Agreement and a no-evidence summary judgment on Lantek's affirmative defenses, including release. Because Peck's response and motion relied upon the same arguments and evidence, we will address them as a whole.

---

[3]Lantek later filed a motion for no-evidence and traditional summary judgment on Peck's counterclaims of fraud, fraudulent inducement, and fraudulent representation. The trial court's order granting this motion is the subject of Peck's cross-appeal. Because we affirm the trial court's order granting Peck's motions for summary judgment on his breach of contract claim and on Lantek's affirmative defenses, we do not reach his cross-appeal. Tex. R. App. P. 47.1. We therefore will not address Lantek's motion as to Peck's counterclaims in this fact section.

6

Peck argued that the term "change order" as it was used in the Settlement Agreement must be construed in light of the other provisions of the Settlement Agreement, the other language in the Subcontract, the circumstances surrounding the parties' entry into the Settlement Agreement, and the industry meaning of the term "change order." In support of his argument, Peck relied upon (1) an affidavit by Keith Cooper, vice president of Manhattan; (2) deposition testimony by Cooper; (3) deposition testimony by David Wick, a vice president of Lantek; and (4) deposition testimony by Ester Mayorga.

### 1. Affidavit by Keith Cooper

Cooper's affidavit authenticated and attached a copy of the Subcontract as Exhibit A to the affidavit. Cooper explained that the scope of work to be performed by Lantek for Terminal B Phase 3 was that set out in Exhibit A to the Subcontract. Cooper interpreted the provisions of the Subcontract relating to the price and explained that the "Subcontract Amount" of $402,155 was "subject to additions and deductions for changes agreed to in writing" and was specifically intended for "Early Start Enabling" as described in Exhibit A.

Cooper then explained that the Subcontract provided a GMP for the scope of work in the sum of $9,190,545 and a separate GMP for the General Conditions of $1,400,915. As Cooper explained, "It is the totality of these amounts that constitutes

7

the entire contract price for Lantek's scope of work for Terminal B Phase 3 pursuant to the Subcontract."[4]

Cooper also attached Change Order One and stated,

This contract document only revises the amount due to Lantek, it does not change the scope of work as set out in Subcontract. As referenced in the "Description" in this Change Order . . . , this change provides for the payment of the GMP for the scope of work, less the Early Start Enabling Partial Funding, revising the contract price to $8,896,628.94. This entire amount is not for any changes to the scope of work, but for the original Terminal B Phase 3 Scope of Work provided by the Subcontract.

Lastly, Cooper attached Change Order Two and explained that "the items [in Change Order Two were] a change in the original scope of work, rather than only a monetary addition for the original scope of work. This amount would not be included in the original Terminal B Scope of Work provided by the Subcontract."

### 2. Cooper's deposition

In his deposition, Cooper identified himself as vice president of Manhattan and testified regarding his experience in the construction industry, particularly the construction of commercial buildings, since the 1960s. Cooper testified that his experience gave him an understanding and knowledge of what the term "change order" means within the construction industry. He testified that an accurate definition of "change order" was: "Written authorization provided to a contractor

---

[4]In subsequent deposition testimony, Cooper clarified that the $1,400,915 of "General Conditions" was a subset of the $9,190,545 GMP amount.

8

approving a change from the original plans, specifications, or other contract documents, as well as a change to the cost." He also approved a lengthier definition provided by Wikipedia[5] that stated, in part, "A change order is work that is added to or deleted from the original scope of work of a contract."

Echoing his affidavit, Cooper confirmed that Exhibit A to the Subcontract provided the entirety of the original scope of work to be performed by Lantek for Phase 3 of the Terminal B project. When asked, "[T]he total subcontract price is that guaranteed maximum price, that GMP that is set out as $9,190,545, correct?" Cooper replied, "That is correct." Cooper also pointed out that the $9,190,545.47 amount corresponded with Lantek's bid amount for the project. And Cooper reiterated that the $402,155 was a partial funding intended to be used to pay "early start enabling" costs.

In addressing the two change orders, Cooper characterized Change Order One as a change order "in name only":

> [Counsel for Peck:] . . . [T]his Change Order No. 1 for Phase 3, it . . . is a change order in name only. And by that, I mean using our definition of change order, there is absolutely no change in the original scope of work. The only change is that now instead of releasing just the seed money, now the entire guaranteed maximum price has been released?
>
>     . . . .

---

[5]As the supreme court has noted, Wikipedia, while inappropriate as the sole source of authority on any issue of significance, can be a valuable and useful resource. *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 436–37 (Tex. 2017).

9

[Cooper:] That's correct.

Cooper testified that Change Order Two, by comparison, was a change order in the true sense of the word because it changed the original scope of work.

While Cooper also testified that a similar payment structure had been used with regard to Phase 2 of the Terminal B project, there is no evidence in this record that Peck was aware of the mechanism or nomenclature chosen to trigger the incorporation of the GMP figure into either contract following the payment of early start enabling costs. Cooper did, however, confirm that Peck played a large part in securing the Terminal B contracts for Lantek and that Peck was "the face of Lantek" before Lantek began work on Phase 1 of the Terminal B project.

### 3. Deposition of David Wick

At the time of his deposition, David Wick was a vice president of Lantek. But prior to Peck's parting ways with Lantek, Wick worked as an estimator and reported to Peck. Wick testified that Peck's primary role at Lantek was to secure major contracts, especially those worth more than $1,000,000, for Lantek.

Wick signed the Subcontract on Lantek's behalf, and he confirmed Cooper's testimony that Lantek's bid was in the amount of approximately $9,190,000 for Phase 3.[6] He also verified the accuracy of the statements made by Cooper in his

---

[6]Wick also clarified that the Guaranteed Maximum Price decreased slightly after mistakes were corrected. As indicated above, because the parties have stipulated as to the amount of Peck's damages if the trial court's order granting Peck's summary

affidavit, including those explaining the amount to be paid to Lantek for performance of the scope of work covered by the Subcontract.

Wick also echoed Cooper's testimony regarding the payment arrangements for Phase 2 of the Terminal B project and testified that the Phase 2 subcontract also provided for an early start enabling partial funding component and for payment of the remainder of the GMP by change order.

### 4. Deposition of Ester Mayorga

Peck also attached excerpts from the deposition of Lantek shareholder Ester Mayorga. In her deposition, Mayorga testified that her understanding of the meaning of "change order" was, "[W]e are either getting more work and more money or they're removing some of the work from our project and giving us I guess a credit is what I would call it for work not being performed."

## IV. The trial court ruled in favor of Peck.

The trial court granted Peck's motion for summary judgment on his breach of contract claim and as to Lantek's affirmative defenses. In granting Peck's motion for summary judgment, the trial court ordered:

- Peck is awarded judgment on his breach of contract claim against Lantek . . . in the amount of $556,594.73 with adjustments to be determined, such amount being 10% of the original scope of work awarded to Lantek in the Phase 3 Subcontract for the DFW Terminal B Project;

judgment is affirmed on appeal, we refer to the $9,190,545 figure as the GMP in the Subcontract.

11

- The issue of attorneys' fees to be awarded to Peck and against Lantek will be determined by further judgment or order of the Court;

- Peck's no evidence summary judgment regarding Lantek's affirmative defense[] of . . . release is GRANTED and such affirmative defense[] [is] denied[.]

The parties later entered into a stipulation and rule 11 agreement that $547,529.65, less the $40,215.50 already paid to Peck, in damages and attorneys' fees would be owed by Lantek if Peck's summary judgment motion was affirmed on appeal, while expressly reserving their rights to appeal.

Lantek brings three issues on appeal. The first two issues complain of the trial court's grant of summary judgment in Peck's favor. In its first issue, Lantek argues that Peck is only entitled to 10% of $402,155 and was not entitled to any of the $8,494,473.94 payment authorized by Change Order One. Lantek argues in its second issue that, alternatively, the Settlement Agreement is ambiguous and therefore a fact issue exists. Finally, in its third issue, Lantek argues that Peck was not entitled to recover his attorney's fees because he released any such claim for relief in a release executed after the Settlement Agreement.

**Standard of Review**

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex.

12

2009). We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort*, 289 S.W.3d at 848. We must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented. *See Wal-Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex. 2006); *City of Keller v. Wilson*, 168 S.W.3d 802, 822–24 (Tex. 2005).

The summary judgment will be affirmed only if the record establishes that the movant has conclusively proved all essential elements of the movant's cause of action or defense as a matter of law. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979).

## Discussion

## I. Discerning the meaning of the term "Change Order"

Because words are imperfect tools of communication, *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 764 (Tex. 2018), we are cautioned, both in law and in literature, that we must look beyond artificial labels to determine truth:

13

> O, be some other name!
> What's in a name?  That which we call a rose
> By any other word would smell as sweet

William Shakespeare, Romeo and Juliet, act 2, sc. 2.

In this case we are called upon to decide whether that which Lantek called a "change order" is, in fact, a change order.  In other words, we must determine whether the $8,494,473.94 payment authorization came about as a part of the base contract itself or by way of a change order, as it was titled, looking beyond the bare words themselves.

As Justice Oliver Wendell Holmes so eloquently explained one hundred years ago, "A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used." *Towne v. Eisner*, 245 U.S. 418, 425, 38 S. Ct. 158, 159 (1918).  Thus, Holmes, in discussing the "hollow forms of words," cautioned us to "*think things, not words*;" otherwise, "we must constantly translate our words into the facts for which they stand, if we are to keep to the real and the true."  Oliver W. Holmes, *Law in Science and Science in Law*, 12 Harv. L. Rev. 443, 460 (1899).

The supreme court has guided us that in this endeavor we must define the term "change order" as it is commonly used in construction contracts such as the one here. *See URI*, 543 S.W.3d at 764.  We may not consider extrinsic evidence "for the purpose of creating an ambiguity or to give the contract a meaning different from that which

14

its language imports."[7]  *Id.*  But we are not prohibited from considering the facts and circumstances that surrounded the execution of the Settlement Agreement in order to elucidate the meaning of the words employed.  *Id.* at 765.  Indeed, considerations of trade usage and custom have generally been considered to be in that category of extrinsic evidence which we may and should consider.  *Id.* at 768 (citing *Hous. Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 470 (Tex. 2011) (considering trade custom as bearing on the parties' objective intent in striking language from an insurance contract)).  As the supreme court has explained, trade usage may be considered because "the meaning to which a certain term or phrase is most reasonably susceptible is the one which [is] so regularly observed in place, vocation, trade, or industry so 'as to justify an expectation that it will be observed with respect to a particular agreement.'"  *Nat'l Union Fire Ins. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 n.6 (Tex. 1995) (op. on reh'g) (quoting Restatement (Second) of Contracts § 222(1)); *see also Frost v. Martin*, 203 S.W. 72, 74 (Tex. Civ. App.—Fort Worth 1918, no writ) (explaining the "well-recognized canon of construction that technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless it is evident that they were used in a different sense").

---

[7]The supreme court has distinguished "extrinsic evidence that illuminates contract language and extrinsic evidence that adds to, alters, or contradicts the contract's text."  *Id.* at 767.

15

Our primary concern in construing the Settlement Agreement is to ascertain the true intentions of the parties. *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996) (op. on reh'g). In so doing, "[o]bjective manifestations of intent control, not 'what one side or the other alleges they intended to say but did not.'" *URI*, 543 S.W.3d at 763–64 (footnote omitted) (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010) (op. on reh'g)). We will examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999). We give the language in the contract its plain grammatical meaning unless doing so would defeat the parties' intent, *DeWitt Cty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999), and unless the agreement shows the parties used a term in a technical or different sense, the terms are given their plain, ordinary, and generally accepted meaning, *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). We construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and "will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (citing *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)).

## II. Analysis of the parties' agreement

In its first issue, Lantek argues that the Subcontract only guaranteed a payment of $402,155 to Peck and that because the Settlement Agreement unambiguously excluded change orders, the $8,494,473.94 payment authorized by Change Order One should not be included in the calculation of the amount owed to Peck. In Lantek's argument, the fact that Change Order One is labeled as such ends the analysis and precludes its consideration as part of the contract price. Alternatively, Lantek argues in its second issue that the Settlement Agreement is ambiguous. We disagree with Lantek on both fronts.

### A. Exhibit A to the Subcontract defines the scope of work.

The Settlement Agreement provided that Peck was entitled to 10% of the "initial contract price" which included all "base contract(s) for the scope of work" defined in the June 30, 2011 bid and "anticipated to be awarded by DFW [Airport] in 2016 or 2017," but excluding all change orders. The question before us, then, is whether Change Order One is part of the "base contract[] for the scope of work" or a "change order."

The 2011 bid documents were attached to the Settlement Agreement and consisted of depictions of the layout of Terminal B and designations of the various phases of construction. For example, below is a reproduction of the "Phase 3A" diagram dated June 30, 2011, and attached to the Settlement Agreement:



TERMINAL B - CONCOURSE PLAN - PHASE 3A
PRELIMINARY

These bid documents assist in delineating the parameters of the "scope of work" the parties intended to include when defining the money to be paid to Peck for his work in securing the contract for Lantek. Determining what the scope of work entails and the price to be paid to Lantek for that scope of work necessarily requires us to also look to the terms of the Subcontract.

The Subcontract defined the scope of work to be performed by Lantek as the scope of work that was set out in the attached Exhibit A. Exhibit A described the scope of work as that which was detailed in "Bid Package No. 14A – Communications." Following the introductory paragraph, Bid Package No. 14A contains a 10-page outline of the specific tasks to be completed by Lantek. Those tasks ranged from preconstruction preparation, to demolition, to temporary services

to keep the terminal functioning during construction, to installation of the new communications system, and finally to the completion of the project.

Lantek does not dispute that the scope of work detailed in Exhibit A corresponded to the bid it made for the Phase 3 project (identified in the Subcontract as "Bid Package No. 14A – Communications") and which is referred to in the Settlement Agreement. Additionally, Wick, who by the time of his deposition was a Vice President at Lantek, confirmed that the scope of work covered by the Subcontract and listed in Exhibit A corresponded with the bid submitted by Lantek for the Phase 3 project. Cooper also confirmed the same in his affidavit and in his deposition.

Thus, even when viewing the evidence in the light most favorable to Lantek, the scope of work detailed in Exhibit A to the Subcontract is the same as the scope of work referred to in the Settlement Agreement. Based upon these documents it appears that Peck was entitled to 10% of the contract price for the scope of work listed in Exhibit A to the Subcontract.

## B. A "change order" alters the original scope of work.

Peck provided evidence of the trade usage of the term "change order" through Cooper's deposition testimony. Based on his lengthy experience in the construction industry, Cooper testified that a change order is "[w]ritten authorization provided to a contractor approving a change from the original plans, specifications, or other contract documents, as well as a change to the cost." He also approved of a second,

19

lengthier definition supplied by Wikipedia and that provided in relevant part, "A change order is work that is added to or deleted from the original scope of work of a contract . . . ."

Lantek did not provide any controverting evidence with regard to the definition of the term "change order." To the contrary, one of Lantek's representatives, Ester Mayorga, tacitly agreed with Cooper when she provided a similar definition of the term "change order." According to Mayorga, she understood a change order to mean that Lantek was "either getting more work and more money or [the contractor was] removing some of the work from [the] project and giving . . . a credit . . . for work not being performed."

Thus, the general definition of a change order as established by the summary judgment evidence is a document that authorizes a change from the original scope of work of the project. Using that definition, we must consider whether Change Order One altered the scope of work defined in Exhibit A to the Subcontract. We hold that it did not. The summary judgment evidence conclusively established that Change Order One was a change order in name only.

This interpretation finds support when considering Exhibit A to the Subcontract which, following the outline detailing the scope of work to be completed by Lantek, includes section four, titled "Recap of Contract Amount." The recap lists three cost categories: (1) the "Early Start Enabling (Partial Funding)" cost of

20

$402,155; (2) the GMP of $9,190,545;[8] and (3) the "General Conditions GMP Phase 3" cost of $1,400,915.

The "Early Start Enabling" cost was described as "[a] *portion* of the contract values anticipated . . . for the communications scope of work" and as a "*partial amount*" to be paid as an incentive "to achieve an early start for enabling activities in Phase 3." [Emphasis added.] That the $402,155 amount was intended as a "partial funding" amount was repeated at the conclusion of that paragraph as well.

The "General Conditions" were described as being a separate GMP "within the total GMP proposal." In a table incorporated within section four of Exhibit A to the Subcontract, a listing of the various costs, broken down into the General Conditions (such as staff salary costs and field office costs including office supplies and maintenance) and the "GMP Phase 3 Work" (including labor, materials, and equipment), was provided. This table provided for a total GMP for Phase 3 of $9,190,545.47.

Additionally, we have the benefit of testimony by Cooper not only that the "Early Start Enabling" and "General Conditions" costs were portions of the overall GMP but also confirming that Lantek's original bid provided the $9,190,545.47 sum:

> [Q.] So the original bid would have been based upon that issue for construction as well as those three design change notices. And there, you can see exactly what Lantek would have submitted for those items.

---

[8]The "Early Start Enabling" and "General Conditions" costs were subsets of the overall GMP of $9,190,545.

21

And that's where you get to the total GMP for Phase 3 of the $9,190,545.47?

. . . .

A. Yes, sir.

Likewise, Wick testified that Lantek bid a cost of approximately $9,190,000 for the Phase 3 project. The testimony provided by Cooper and Wick was further supported by the fact that following the designation of the three categories of costs, the Recap includes a line-by-line breakout of costs that ended with the sum, "**TOTAL GMP Phase 3** . . . **$9,190,545.47**."

Despite Change Order One's recitation that the "contract value" was changed by $8,494,473.94, it changed nothing with regard to the scope of work that was listed in Exhibit A. Nor did Lantek submit any evidence of any such changes, instead arguing that the Subcontract "only approved work on a small portion of the overall bid." This is consistent with the Subcontract's provision contemplating the issuance of a change order by Manhattan to pay Lantek the remainder of the contract sum.

The trial court's ruling is also supported by a comparison of Change Order One to Change Order Two. Unlike Change Order One, Change Order Two listed individual line items that explained the addition and subtraction of costs. For instance, one line item deducted $64,906.07 from the money to be paid to Lantek for "Demo Aircraft maintenance space between CL 64-67 E" and another added $4,227.64 for an "Additional Emergency Exit at Passenger Tunnel CL81." Cooper

22

confirmed that these line items altered the scope of work that was listed in Exhibit A to the Subcontract and that Change Order Two was a conventional change order as they are used in the construction industry.

Lantek's interpretation of the contract and argument that Change Order One is excluded from the contract price to which Peck is entitled is unreasonable and out of sync with the general understanding of the term "change order." It also fails to read the Settlement Agreement as a whole, ignoring the connection between the "initial contract price" and the scope of work for the Phase 3 project and the Subcontract's provision that the remainder of the GMP will be paid through a change order.[9]

Finally, Lantek's concern, as it is expressed in its brief, that this interpretation would open the door to a claim by Peck that he is entitled to work for which Lantek submitted later bids for is wholly unfounded. Any subsequent bids would not be included in the "scope of work" that was defined by the parties in the Settlement Agreement.

Having held that the scope of work referred to in the Settlement Agreement is that listed in the Subcontract's Exhibit A with a cost of $9,190,545.47 and having held that Change Order One is a change order in name only, we hold that the trial court

---

[9]Lantek argues that our adoption of Peck's interpretation of the Settlement Agreement renders it ambiguous. Lantek is incorrect. A contract is not rendered ambiguous simply because the parties disagree about its interpretation. *See URI*, 543 S.W.3d at 763.

did not err by refusing to limit Peck's recovery to 10% of $402,155. We therefore overrule Lantek's first and second issues.

## III. Attorney's fees awarded to Peck

In its third issue, Lantek argues that the trial court erred by awarding Peck his attorney's fees because Peck released any claim for attorney's fees in the Amended Mutual Release Agreement (Release). Lantek pleaded release as an affirmative defense to Peck's claim for attorney's fees; Peck moved for no-evidence summary judgment on Lantek's affirmative defenses. The trial court granted Peck's motion for no-evidence summary judgment on Lantek's affirmative defenses, including release.

Sometime after the parties entered into the Settlement Agreement, they executed the Release as a supplement to the Settlement Agreement. In it, Peck agreed to release his claims against Lantek:

> RELEASE BY PECK. With the exception of the duties and obligations stated herein, and for the consideration provided by the Rule 11 Agreement, Peck and anyone claiming by, through or under Peck hereby irrevocably and unconditionally releases, acquits, and forever discharges Lantek and Mayorga of and from any and all Claims and Damages of any kind whatsoever against Lantek or Mayorga related to or arising from Lantek, the Litigation, and the subject matter of the Litigation. Peck acknowledges and agrees that the Release set forth herein is a broad, general and unconditional release that should be liberally construed in favor of Lantek and Mayorga, and by virtue of same Peck does and intends to give up any and all Claims or Damages Peck may have against Lantek or Mayorga, related to or arising from Lantek, the Litigation, and the subject matter of the Litigation.

The "Litigation" was defined as the 2014 lawsuit filed by Peck against Lantek. The definition of "Damages" provided in the Release included attorneys' fees. Lantek

argues that the Release therefore precludes Peck's claim for attorney's fees he incurred in suing to enforce the terms of the Settlement Agreement.[10]

Enforcement of a written settlement agreement is governed by principles of contract law. Tex. Civ. Prac. & Rem. Code Ann. § 154.071(a) (West 2011). Applying those principles, the unjustified breach of a settlement agreement necessarily exposes the breaching party to attorney's fees for enforcement of the contract. *Id.* § 38.001(8) (West 2015) (permitting the recovery of attorney's fees in a breach of contract claim); *Garcia v. Harding*, 545 S.W.3d 8, 12 (Tex. App.—El Paso 2017, no pet.).

Lantek's interpretation ignores two key phrases contained in the Release: (1) the introductory phrase of the release paragraph excluding "the duties and obligations" provided by the Settlement Agreement from Peck's release of claims and damages, and (2) the twice-used phrase "Lantek, the Litigation, and the subject matter of the Litigation." From these two phrases the parties evidenced an intent to exclude from the release obligations arising under the Settlement Agreement and to restrict the release to matters concerning the 2014 lawsuit, not a suit for a breach of the Settlement Agreement that might later be filed.

The Settlement Agreement obligated Lantek to pay Peck 10% of the contract price for the Phase 3 project, and Lantek failed to do so. Peck was entitled to file a

---

[10]Interestingly, Lantek argued to the trial court that Peck also released any claim for breach of contract for Lantek's failure to perform the terms of the Settlement Agreement. Lantek appears to have abandoned this argument on appeal.

claim for breach of contract based on Lantek's failure. Attorneys' fees are recoverable for a claim of breach of contract. Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8). The trial court therefore did not err by granting Peck's no-evidence summary judgment motion on Lantek's affirmative defense of release.

We overrule Lantek's third issue.

## Conclusion

Having overruled all of Lantek's issues and without reaching Peck's issue presented by cross-appeal, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: October 18, 2018